Succession of Ball.

## No. 10,789.

SUCCESSION OF WILLIAM BALL. OPPOSITION OF HEIRS OF IMMER BALL. INTERVENTION OF HEIRS OF WILLIAM BALL.

1. An action against a succession for the recovery of the amount of a particular legacy, is prescriptable by ten years from the date of demand for payment could have been made.

2. While the right of action of the forced heirs to sue for the reduction of dona- tion *mortis causa* arises on the death of the testator against which the prescription of five years is provided, yet an exception exists in case the succession of the deceased is apparently insolvent.

3. In case the testimony shows that the succession was insolvent at the date of the testator's death, and that, by dint of good management and favorable set- tlement of debts, something has been saved from the wreck of his fortunes, the profit does not enure to the benefit of particular legatees.

APPEAL from the Fifteenth District Court for the Parish of West Baton Rouge. *Semple, J.*

*R. C. Wickliffe* and *S. Mc. C. Lawrason* for the Appellants.

*W. W. Leake* for the Appellees.

The opinion of the court was delivered by

WATKINS, J. This appeal is a supplement to the one we had before us last year. 42 An. 204.

That appeal presented two accounts of administration—one pro- visional and the other a final account of the succession of William Ball—both of which were opposed by the heirs of Immer W. Ball, deceased brother of William, on the ground that the amount of a particular legacy of $2500 in his favor had not been placed thereon; and they demanded that the account be so amended as to recognize them as entitled to demand and receive that sum from the succession of the deceased.

The forced heirs of William Ball filed an intervention in which they joined the executors praying for the homologation of the account and for a judgment reducing the legacy to the disposable *quantum*, as interfering with their *legitime;* and alleging, in the alternative, the insolvency of the succession at the date same was opened by the death of the deceased.

The judge *a quo* dismissed this intervention and we reversed his judgment and remanded the cause for a new trial on the issue thus joined.

On the new trial judgment was rendered sustaining opponent's plea of five years' prescription against the action of reduction, as to all the heirs of the deceased except Mrs. Eva Hamilton, and reduced the donation to I. W. Ball one-sixth—the judgment theretofore rendered on the oppositions to the accounts remaining undisturbed.

From this judgment the executors and heirs of William Ball, other than Mrs. Eva Hamilton, have appealed.

In this court the appellants have filed a plea of five and ten years' prescription against the demand and action of the heirs of the deceased legatee; and the appellees have filed an answer to the appeal and pray that the judgment be so amended and increased as to allow their claim in full.

I.

In regard to the prescription urged against the demands of the opponents we find the facts to be as follows, viz:

Dr. William Ball died testate, in 1876, leaving a widow and six children. His will was opened and probated in July, 1877. The executors filed a provisional account in 1880, in which no mention was made of the particular legacy in favor of Dr. Immer W. Ball. This account was duly homologated. Subsequently the surviving widow and the eldest son of the deceased, who were his executors, seem to have acted with the property as their own, and operated and managed the plantation, and appropriated its revenues to their own support, and that of the family. In January, 1887, the heirs of the deceased legatee—Dr. Immer W. Ball having died meanwhile—made demand upon the executors for the payment of the legacy, and the filing of a final account. This demand was resisted by the executors, on the ground "that, under a proper construction of the will, the legacy was not due and payable." This construction was refused by the judge *a quo*, and we affirmed the judgment in March, 1888. Ball vs. Executors, 40 An. 284.

That suit was pending, and undetermined, for about fourteen months. Ever since the final disposition of the case the issues involved in this litigation have been agitated, without any considerable intermission of time. Between the date at which the will of Dr.

William Ball was probated and the institution of the suit for the legacy, ten years did not intervene, and consequently, the prescription of ten years was not completed. R. C. C. 3544.

Indeed, the failure of the executors to urge this plea in the former suit, in which the validity of the legacy was distinctly an issue, appears to us to have been an abandonment of it, though we have chosen to treat it as *res nova* in respect to the heirs, and decide it.

## II.

In respect to the prescription of the action of the major heirs for a reduction of the donation *mortis causa,* quite a nice question is raised. The District Judge maintained the plea and dismissed the demands of the intervenors. But we think the record discloses a state of facts to which the rule of prescription invoked does not apply.

In treating of the propriety of relegating to future adjustment the *legitime* of the forced heirs of John T. Moore, we had occasion to say " that such an issue is to be determined in the *mortuaria*, and before the succession of the deceased is wound up; " and as a reason for that opinion, we said " the Code declares that forced heirs can sue for the reduction of excessive donations, whether *inter vivos* or *mortis causa,* ' on the death of the donor or testator.' R. C. C. 1504. It also declares that ' actions for the reduction of excessive donations' are prescribed by five years. R. C. C. 3542. The death of the donor or testator is the date from which this prescription begins to run." Succession of Moore, 42 An. 332.

It will be observed that this was not an expression of opinion on the question of prescription, and can not, for that reason, be considered as strictly authoritative on that subject, while it is a correct exposition of the language of those articles of the Code.

But there are other articles of the Code which, under exceptional circumstances—not existing in the succession of Moore—serve to *suspend* the prescription of the action of reduction.

While it is formally declared in R. C. C. 1504, that " on the death of the donor or testator, the reduction of the donation, whether *inter vivos* or *mortis causa,* can be sued for by forced heirs;" yet Article 1634 declares that particular legacies can not be discharged until " after the payment of the debts and the contributions for the legitimate portion in case there are forced heirs."

Construing those two articles together, it is manifest that if the succession of the deceased testator appears to be seriously involved in debt, and its solvency thereby rendered problematical, the legatee, by particular title, is dispensed from making demand for the payment of the legacy due, and the forced heirs are equally dispensed from suing for the reduction thereof, because, until the solvency or insolvency of the succession is first ascertained, the latter can not know whether or not there is danger of particular legacies impinging upon their *legitime*. Hence, it is equally obvious that Article 1504 does not fix any absolute date for the institution of suits in reduction in all cases, but it simply provides that "on the death of the donor or testator the reduction of a donation *can* be sued for." Like other rules of law, it has its exceptions.

In this case there is a serious question raised in reference to the solvency of the succession of William Ball. The executors and heirs contend that it was completely insolvent; and the District Judge concurred in this view, notwithstanding he sustained opponents' plea of prescription. Under this state of facts as applied to the cited articles of the Code, we are of opinion that the plea was incorrectly sustained; though our learned brother of the District Court could not well have decided otherwise, as we are not aware of this ruling having been made in any previous case.

### III.

The remaining question for decision is whether the succession of William Ball was solvent at the time of his death and, if solvent, to what extent.

In our opinion in this case, when it was last before us, we said:

"It is elementary that in calculating the disposable *quantum* reference is had exclusively to the conditions existing at the moment of the ancestor's death, to the value of the property at that time and to the debts due by him. If the amount of the debts due at the death exceeds the value of the property found in his estate, there can be no disposable (portion) left for the satisfaction of legacies. No subsequent changes in the conditions, however operated, whether by increment in value of the property or by prescription or other extinguishment of debts, can affect the case." Succession of William Ball, 42 An. 204.

On this issue the facts appear to be as follows, viz:

An inventory of the property of William Ball was taken on the 30th of January, 1877, on which appear the following items of property and the valuations placed upon them:

| | |
|---|---|
| 1. The Mount Vernon plantation, containing 1720 acres, valued at ......  ........ | $6,000 |
| 2. Two other small tracts, at .........  ...............  ......  .................  ...................... | 100 |
| 3. Rent note of J. N. Ball, of the Mount Vernon plantation, for 1878 of $2500, at | 500 |
| 4. Four other rent notes of same lessee for the lease of same plantation for each of the years 1879, 1880, 1881 and 1882 for $3000 at........  ......  ...  .......  ............. | 2,000 |
| 5. Other notes of the same party.....................  .......  .........  ..............  . ................. | 500 |
| 6. Two life insurance policies .........  ...................................  .....  .....　.................. | 10,000 |
| 7. A few articles of personalty......................　.......  ......................  ......  .. .. ............ | 110 |

| | |
|---|---|
| Aggregate valuation ...........  ...................................  ...................  .....  ........................ | $19,210 |

| | |
|---|---|
| As against these values it is claimed on the part of the executors and heirs that the ordinary debts of the deceased aggregated....  .....  ...............$22,609 | 26 |
| Note due Louisiana National Bank...........  ...................................  .  .................. 4,500 | 00 |
| Privileged succession debts .............  ........................................  .....  .................. 853 | 00 |
| Executor's commissions .................  .........  ......  .  ..........................  ..  ... 539 | 55 |

| | |
|---|---|
| Aggregating in amount .......  ......  ...........................  ..........  ...  ..............  ..........$28,501 | 81 |

Thus showing the succession to be involved to the extent of $9,-291.87.

The account filed in 1881 shows some additional values tending to increase the worth of the succession assets by about $3,500 or $4,000, though still leaving a shortage of $5000, or over.

The opponents' counsel claim that the inventoried value of the plantation was much too low, and that it should have been placed at $15,000; and that the notes of J. N. Ball were placed at too low a figure. By this means he insists that the difference, of say $5000, is overcome, and the succession proven to be solvent.

While there is considerable evidence in the record indicating that $6000 was a low appraisement for the plantation, in 1877, when the inventory was taken, yet it is a difficult question to determine, in 1891—near fifteen years thereafter—how much more than $6000 was its *actual cash value*, at that time.

It is true that in 1868—near ten years prior to his death—William Ball purchased this property for the sum of $15,000, on terms of credit; but the vendor reserved a mortgage and required additional security. He, also, subsequently improved the property, by the addition of buildings, and the repair of old ones. The amount of the cost of these buildings and repairs, possibly increased the comfort and utility of the plantation, but it is doubtful whether they increased its sale value to any considerable extent. Taken all in all, and considering all of the evidence on that question, we are disposed to regard $8500 as about the actual cash valuation that should have been placed on the property at the time.

While it is true that a larger amount was realized on the rent notes than they were appraised at, in January, 1877, yet those notes were for *future* instalments of rent during the years 1877, 1878, 1879, 1880, 1881 and 1882, and our province is to ascertain what such paper was worth at the date the inventory was taken and not what was realized on them in the respective years in which they went to their maturities. It seems quite reasonable that the appraisers should have placed them at the value they did, which was about one-third of the amount collected on them several years afterward.

Much the same may be said of the stock note. But if the difference of $1800 claimed should be allowed in the calculation, yet the increased allowance would only amount to $4300—thus leaving the succession insolvent to. the extent of $750. These figures are not submitted as the result of mathematical calculations, but merely for the purpose of illustrating the argument.

Our conclusion is that the succession of William Ball was insolvent at the date it was opened. It was evidently so considered by the executors and heirs.

And the prolonged silence and inaction of the heirs of the deceased legatee possess a like significance. If by dint of good management and the favorable settlement of succession debts and those of the deceased the heirs have saved something out of the wreck, the profit does not enure to the benefit of the heirs of the particular legatee. If, in point of fact, the succession was solvent, there was a plain course open to them, and that was to insist on payment; and, if they have sustained loss, it has been occasioned by their neglect to take timely steps to ascertain and enforce their rights.

The judgment appealed from must be reversed.

It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled and reversed, and it is now ordered and decreed that the demands of opponents be rejected at their costs in both courts.